## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**UNITED STATES OF AMERICA**                                    **PLAINTIFFS**
*ex rel*. **Jeremy Westfall, Russell Bourland, and Richi Lesley**

**v.**                                    **CIVIL ACTION NO. 3:15cv376-CWR-ASH**

**MEDWORX COMPOUNDING, LLC**
**CHRIS GAINES & JOHN DOES 1-10**                              **DEFENDANTS**

### UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court are (1) Relators' motion for a default judgment on damages and (2) Relators' motion for a relator share of the proceeds of the Wade Walters ("Walters") and Thomas Edward Spell, Jr. ("Spell") criminal prosecutions. In addition to briefing by Relators and the United States, an evidentiary hearing was held on July 22–26, 2024. As directed by the Court at the conclusion of that hearing, the United States now submits its proposed findings of fact and conclusions of law.[1]

### PROPOSED FINDINGS OF FACT

Relators Jeremey Westfall ("Westfall"), Russell Bourland ("Bourland"), and Richi Lesley ("Lesley") filed this *qui tam* action under seal on May 21, 2015, pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., and the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b. *See* G-1 (Complaint). Relators named two defendants in their *qui tam* action, Chris Gains ("Gaines") and Medworx Compounding, LLC ("Medworx"). *Id*. Relators alleged that Medworx unlawfully paid commissions to Brian Senn ("Senn"), an independent contractor sales representative ("1099 marketer"), to solicit compound drug prescriptions for TRICARE

---

[1] Citations to the hearing transcript ("Tr.") refer to the *Transcript of Evidentiary Hearing*, Vols. I-V, (July 22 – July 26, 2024).

beneficiaries to be filled at Medworx. *Id*. Relators alleged generally that Medworx also paid unlawful commissions to other unnamed 1099 marketers, and that "Senn was recruited into the fraudulent scheme by Defendant Chris Gaines." *Id.*

Prior to Relators' May 21, 2015, *qui tam* complaint, the Government had been actively investigating compound drug fraud schemes involving multiple pharmacies, physicians, pharmacy owners, and marketers in Mississippi and elsewhere, to include Medworx, Walters, and Spell. These investigations ultimately led to the conviction of Spell, Walters, and at least 16 other individuals in the Southern District of Mississippi. Tr. at 466:25–471:4. Independent criminal investigations in other jurisdictions resulted in over ten convictions in the Southern District of California, as well as numerous prosecutions in Alabama and Arkansas. *See id.* at 645:14–646:1; 495:17–497:10; *see also* R-61–R-66. None of the aforementioned criminal investigations resulted from information provided by Relators.

## I.     The Government's Criminal Investigations

### a.   *Case Openings and Initial Investigation*

On or about February 3, 2015, the Federal Bureau of Investigation ("FBI") opened a criminal investigation into allegations involving Medworx, Spell, Walters, and others. Tr. at 466:13-22; 495:12-16. The FBI's investigation was prompted by a referral from the Mississippi Attorney General's Office ("MS AG") in January 2015. *Id*. at 467:1-25. Preceding the January 2015 referral to the FBI, the MS AG had been investigating allegations about the waiver of patient co-payments, the swapping of ingredients in compound drugs to increase reimbursement, commission payments to marketers, the lack of patient-doctor relationships, and kickbacks to prescribers and patients. *Id*. at 467:10-21.

At the time of the January 2015 MS AG referral, the FBI was already familiar with similar compounding pharmacy schemes and allegations. *Id.* at 469:9-16. The FBI had an existing investigation on Advantage Pharmacy, another compounding pharmacy connected to Walters, located in Hattiesburg, Mississippi. *Id*. at 469:9-20. The Advantage investigation involved similar conduct. *Id*. Also predating Relators' complaint, the FBI opened a third investigation involving Walters and similar compound drug schemes connected to World Health Industries, Inc., a compounding pharmacy located in Jackson, Mississippi. *Id*. at 470:8-17; *see also* G-27 (Government Timeline Demonstrative).

The Government's criminal investigations focused on Spell, Walters, Medworx, Advantage, World Health, and many other pharmacy owners, physicians, and marketers. The conduct at issue included changing ingredients in prescriptions to maximize reimbursements; writing and filling prescriptions without a doctor-patient relationship; automatic refills when the beneficiary did not request or want the medication; payments made to doctors, patients, and marketers; forged prescriptions; the waiver of patient co-payments; and money laundering. Tr. at 470:18–471:22, 472:5-23. From the inception of these investigations, the Government focused on the pharmacies' alteration of compound drug formulas to substitute higher reimbursing ingredients. *Id*. at 484:20–486:9; 502:21–503:5. Instead of basing formulas on patient need or efficacy, Walters, Spell, and others altered formulas and selected and substituted ingredients in order to increase reimbursements and maximize profits. *Id.* This included dispensing formulas that differed from what was prescribed. *Id.*

In addition to the FBI, numerous other federal agencies were involved in the criminal investigations, including the Internal Revenue Service ("IRS"), Criminal Investigations Division;

Defense Criminal Investigative Service ("DCIS"); United States Department of Labor, Office of the Inspector General; Postal Inspection Services; and others. *Id*. at 468:21–469:8.

    b. *2015: Covert Investigation*

For approximately 12 months, investigators worked covertly and, among other things, collected information from financial institutions, insurance companies, and government agencies. *Id.* at 473:2–474:9; 695:23–696:6; 698:5-22. A substantial amount of information was collected prior to the summer of 2015. *Id*. at 524:14-24. IRS Special Agent ("SA") Darren Mayer testified that he was assigned as a co-case agent in June 2015 because of the voluminous financial records the FBI had already obtained. *Id*. at 696:2-20. Agents analyzed over a thousand bank accounts. *Id*. at 697:16–698:4. The Government also obtained and analyzed claims data and obtained information from confidential human sources, or confidential informants. *Id*. at 473:9–474:9.

In the summer of 2015, the FBI, along with numerous other agencies such as IRS, DCIS, U.S. Department of Health and Human Services Office of the Inspector General ("HHS OIG"), Veterans Administration, and others, began planning a massive search and seizure operation involving the compounding pharmacies under investigation. *Id*. at 474:10–476:16.

    c. *January 2016 Searches and Seizures and Continued Investigation*

On January 21, 2016, the Government executed simultaneous search warrants at ten different pharmacy locations in Mississippi and other states. *Id*. at 475:12-22; 476:7-25. Concurrently, the Government executed warrants to seize substantial assets, including cars, real estate, aircraft, and bank accounts. *Id*. at 475:12–476:16. This included $2,507,549.04 seized from two Medworx-owned bank accounts. *Id*. at 700:1–701:21. All other assets were seized from other individuals and entities.[2] *Id.* at 701:14-21; 703:17-22; G-4; G-7.

---

[2] With the exception of the two Medworx accounts, the other accounts listed in the Spell and Walters criminal forfeiture orders were owned by Spell, Walters, and/or other entities. Tr. at 701:17-21; *see also* G-

In conjunction with the search and seizure warrants, the Government interviewed over 300 people on or shortly after January 21, 2016. Tr. at 476:7–477:9. This included pharmacy employees, doctors, patients, marketers, and others. *Id.* at 476:11-12; 477:3-9. This massive undertaking included more than 80 interview leads sent to other FBI offices across the country. *Id.* at 477:5-9. Gaines and Senn were among the hundreds of people interviewed at that time. *Id.* at 635:15-24. Interview leads sent to the FBI in Arkansas ultimately led to the opening of an independent investigation in Little Rock. *Id.* at 496:5-12. This independent investigation resulted in the prosecution of defendants in the Eastern District of Arkansas, to include Glenn Hudson ("Hudson"), Brad Duke ("Duke"), Dr. Joe May, and others. *Id.* at 496:13-19; R-61–R-66.

The January search and seizure operations and witness interviews required the dedication of substantial Government resources, including the involvement of approximately a dozen agencies and hundreds of agents, analysts, and evidence personnel. Tr. at 475:12–476:16. The criminal team seized hundreds of boxes of records and several terabytes of data that were delegated to different offices to assist with the review. *Id.* at 483:5-12. Computers were forensically copied onto an IRS server to facilitate agents' review of the digital material. *Id.* The document review and witness interviews produced additional leads and follow-up steps for the team. *Id.* at 483:21-25.

d.  *California and Alabama Investigations*

The criminal investigators in Mississippi also worked with investigators in the Southern District of California and the Northern District of Alabama. The investigations in those districts

---

4–G-7. Entities such as Medworx Sunflower Series 1 were not Medworx assets. Tr. at 702:21-24; 703:3-8; *see* G-4. Nor have Relators established evidence that assets like Medworx Sunflower Series 1 had any connection to the 1099 marketing scheme alleged in Relators' complaint. These were individual LLCs created and owned by Walters, Spell, and other individuals, including physicians. Medworx did not have an ownership interest in these LLCs. Tr. at 702:21-24. SA Mayer explained that Medworx paid this LLC for prescriptions written by physicians who held ownership interests in the LLC, and funds were then distributed through the LLC to those physicians. *Id.* at 702:14–703:2. Additional LLCs with similar names, such as Medworx Sunflower Series 2, 3, and 4, operated in the same way. *Id.* at 702:3-8.

involved other pharmacies that had ties to some of the same individuals and similar schemes. Tr. at 496:23–497:6. Those investigations were not triggered by the Mississippi investigation. Rather, both districts independently opened their investigations. *Id*. at 497:7-10.

In particular, the Southern District of California received a DCIS referral from the Defense Health Agency ("DHA") in early March 2015. *See id.* at 641:4-7; *see also* G-27. The referral stemmed from a hotline tip about a Utah pharmacy, CFK, Inc. d/b/a The Medicine Shoppe ("CFK/Medicine Shoppe"), that was filling prescriptions for TRICARE beneficiaries who had not been examined by a physician. Tr. at 641:4–642:1. The individuals investigated as part of the CFK/Medicine Shoppe case included Ashley and Jimmy Collins ("the Collinses"), who co-owned ChoiceMd, a medical clinic in Tennessee. *Id.* at 642:10-12. The Collinses employed and paid two physicians and a nurse practitioner to sign prescriptions for beneficiaries primarily located in Southern California and whom they never examined. *Id.* at 642:5–643:14. The Collinses also used marketers to implement a sham drug study and paid TRICARE beneficiaries $300 per month for their personal information used on these prescriptions. *Id*. at 644:1-8. CFK/Medicine Shoppe submitted claims to TRICARE for prescriptions generated through these schemes. *Id*. at 645:1-13. TRICARE paid CFK/Medicine Shoppe for the claim submissions. *Id*. The United States Attorney's Office for the Southern District of California ultimately prosecuted the Collinses, the three medical providers who worked for them, five primary marketers who paid beneficiaries for the sham drug study, and CFK/Medicine Shoppe, which was owned by Spell and Walters. *Id.* at 645:14–646:1.

e. *FBI Interview of Relators*

FBI SA Champney testified that he received Relators' complaint in the summer of 2015. *Id*. at 501:15-18. On April 4, 2016, the FBI and DCIS interviewed the three Relators. *Id.* at 486:15–487:2; 636:25–637:3. During their interviews, Relators did not provide information about Spell or

Walters. *Id.* at 488:10-13. Nor did they provide information about CFK/Medicine Shoppe, the Collinses, Duke, or Hudson. *Id.* at 489:5-15. And they did not provide direct information about payments to Gaines or Gaines' company CD Medical, Inc. ("CD Medical"). *Id.* at 488:7-9. The information Relators provided was limited to their complaint, written disclosure statements, and two transcribed recorded conversations between Bourland and Senn that were provided to the FBI in 2016.[3] *Id.* at 487:17–488:3; 636:11–637:4, 637:22-25. The limited information provided by Relators did not contribute to the criminal prosecutions or advance the criminal investigations. *Id.* at 490:10-11.

## II.    Spell's and Walters' Criminal Pleas and Judgments

a.    *Tommy Spell*

On August 9, 2018, Spell pled guilty to one count of conspiracy to commit health care fraud. *See* R-4 (Spell Criminal Judgment). Spell did not plead guilty to a violation of the AKS, and unlike Relators' *qui tam* complaint, the criminal case was not premised simply on the flow of money from Medworx to 1099 marketers. Rather, Spell pled guilty to an expansive health care fraud conspiracy including the interchanging of ingredients to maximize profits and without regard to patient need, the fraudulent waiver of patient co-payments, and the mass production of compound medications. Tr. at 492:16-24; R-13 at 20-23 (Spell Plea Transcript). The conspiracy described at Spell's plea hearing also included payments to marketers to obtain prescriptions regardless of patient need. R-13 at 20-23.

As part of his sentence, Spell was ordered to pay $243,550,503 in restitution to the victim, Defense Health Agency (TRICARE). R-4. The Government calculated this loss to TRICARE by

---

[3] On August 19, 2015, Relators provided the transcripts of these conversation to HHS-OIG SA Lynn Melear. Tr. at 634:20-23. SA Champney testified that he reviewed the recordings when the FBI received them in 2016. *Id.* at 603:19–604:5. These recorded conversations did not mention Spell or Walters. *Id.* at 351:5-10.

totaling all TRICARE reimbursements paid to pharmacies affiliated with Spell from 2014 to 2016. Tr. at 491:6–492:6. These pharmacies included Medworx, Sunflower (Ruleville, MS), CFK/Medicine Shoppe (Utah), and Southern Compounding (Alabama). *Id*. at 491:20-24; 586:1-12. The Government's loss was not calculated by matching pharmacy claims to Medworx commission payments. *Id*. at 492:7-13. Instead, the Government's loss was based on the entire fraudulent scheme, including changing ingredients to maximize TRICARE reimbursements regardless of patient need and fraudulently concealing the waiver of patient co-payments. Further, the restitution amount involved claim submissions to TRICARE from multiple pharmacies and was not limited to claims submitted by Medworx. *Id*. at 492:25–493:2; R-13 at 20-23. In addition to restitution, the court also ordered criminal forfeiture of a number of Spell's assets. G-4.

   b.  *Wade Walters*

On July 9, 2020, Walters pled guilty to conspiracy to commit health care fraud as well as conspiracy to commit money laundering. R-12 (Walters Criminal Judgment). As with Spell, Walters did not plead guilty to a violation of the AKS, and the criminal case was not premised simply on the flow of money from Medworx to 1099 marketers. Walters pled guilty to wide-ranging criminal conduct beginning in September 2012 and relating to numerous pharmacies and other entities, such as Advantage, World Health, CFK/Medicine Shoppe, and Medworx. *United States v. Walters*, 2:20-cr-26 (S.D. Miss. Jan. 13, 2021), ECF No. 75 (hereinafter "Walters Plea Tr."), at 27.[4] This criminal conduct included Walters' adjustments to prescription formulas to ensure the highest reimbursement without regard to medical efficacy; paying recruiters to procure prescriptions for high margin compounded medications; obtaining prescriptions with no valid

---

[4] The Court may take judicial notice of the transcript of Walters' plea hearing. *See* Tr. at 293:15–294:6; 411:18–413:8 (taking judicial notice of other court documents publicly filed in this district, including Walters' criminal case).

doctor-patient relationship; soliciting and incentivizing practitioners to authorize prescriptions of compounded medications; routinely and systematically waiving or reducing co-payments to be paid by beneficiaries; and using a purported co-payment assistance program to falsely make it appear as if the pharmacies were collecting co-payments. *Id*. at 27-28. Walters' criminal conduct also included a money laundering scheme, known as Intellectual Property Management Services ("IPMS"), from December 2013 through January 2016. *Id*. at 32-34.

Through the above conduct, Walters defrauded healthcare benefit programs, including TRICARE, of more than $287 million. *Id.* at 32. Walters was ordered to pay $287,659,569 in restitution, including $243,550,503 that was owed jointly and severally with Spell. R-12. The court also ordered criminal forfeiture of a number of Walters' assets, which included accounts and entities unrelated to Medworx. *See* G-5–G-7. (Walters Forfeiture Orders).

### III.    Relators' Timing, Utility, and Knowledge

a.    *The scope and timing of Relators' qui tam allegations*

Relators' complaint was not filed until May 21, 2015, after the Government's criminal investigations were well underway.  Relators did not provide any information to the Government prior to the filing of their complaint. Tr. at 316:21-23.

The Relators' limited knowledge did not contribute to the prosecutions of Spell, Walters, or any other individuals. *See id.* at 490:6-11. Relators' complaint is limited to claims that Medworx violated the AKS by making commission payments to Senn. *See* G-1; Tr. at 324:17–325:20. At the evidentiary hearing, Bourland acknowledged that the only specific conduct Relators alleged against Medworx was commission payments to Senn. Tr. at 326:16–327:13. Bourland acknowledged that the complaint does not allege any actual commission payments from Medworx to Gaines or any other 1099 marketers. *Id*. at 326:16–327:13.

9

Relators did not name Spell or Walters as defendants in their *qui tam* complaint. *See* G-1. During the evidentiary hearing, Bourland testified that he did not know Spell or Walters, had never spoken to them, and did not provide the Government with any information about either of them. Tr. at 317:18–318:11; 319:7-9; 327:13-15. Bourland affirmed that there are no references to Spell or Walters in his disclosure statement, Relators' complaint, or the recorded phone calls Relators provided to the Government. *Id*. at 304:8-25; 317:18-25; 318:1-13; 320:12–321:9; 327:14-24; 351:5-17; *see also* G-8, G-13, G-19; R-56–R-58 (Relators' Disclosure Statements). Moreover, Bourland affirmed that there are no references in the complaint to the conduct that formed much of the focus in the criminal cases, such as the waiver of patient co-payments or the manipulation of ingredients to maximize reimbursement from TRICARE. Tr. at 326:21–327:10.

Relators' complaint and disclosure statements also did not identify any doctors, any marketers other than Senn, any information that Senn was paid by Gaines, or any information about payments made to physicians. *Id*. at 321:10-19; 322:4-7; 326:16-25. And finally, Relators did not reference CFK/Medicine Shoppe, Sunflower, or any other pharmacies in their complaint or disclosure statements; nor did they allege that Medworx caused other pharmacies to submit false claims. *Id*. at 321:15-16; 327:20-23; *see also* G-8, G-13, G-19; R-56–R-58. Bourland affirmed that when he submitted his disclosure statement to the Government, he provided all the information he knew about the claims he was bringing in the *qui tam* action. Tr. at 304:8-14; 320:6-15.

b. *Source of Relators' Information*

On January 15, 2015, Bourland first learned through a conversation with Senn that Senn had an opportunity to receive large commission payments from Medworx based on prescriptions he generated. *Id.* at 302:3-21; 305:19–306:22; 317:14-17. Relators have not identified any information they acquired about Medworx prior to this telephone call with Senn. *Id*. at 305:12-16.

10

Although Bourland testified that he knew Senn's conduct to be fraudulent and illegal, Relators did not report the fraud to the Government. *Id.* at 308:19–309:4; 351:21–352:11. Instead, Bourland recruited his stepbrother to provide his personal TRICARE information to Senn in order to obtain Medworx prescriptions. *Id*. at 314:16-25. These prescriptions ultimately cost TRICARE more than $180,000. *See* R-19 (Sum in Paid Claims tab of "Paid_Amt" for all original claims and refills for three prescriptions with "Bene_Name" Michael Spears and "Write_Dt" of 1/23/2015). Because Bourland recruited his stepbrother to obtain these prescriptions, Senn paid Bourland a commission in the amount of $10,250.99. Tr. at 315:22-25; 324:7-8. Apart from these three prescriptions filled on January 23, 2015, on behalf of Bourland's stepbrother, Relators were not aware of any other specific prescriptions that were billed by Medworx to TRICARE. *Id*. at 317:3-17.

Bourland testified during the evidentiary hearing that he never worked at Medworx, did not know anyone at Medworx, and never spoke with anyone who worked at Medworx. *Id.* at 319:11-16. Nor had Bourland met or communicated with Gaines prior to filing the complaint. *Id*. at 319:17-25–320:1-5. Relators Lesley and Westfall generally learned information relayed to them by Bourland. *See id*. at 334:19-24; s*ee generally* G-13, G-19 (Westfall and Lesley Disclosure Statements). They did not have additional personal knowledge of their own. *See* G-13, G-19.

Prior to the filing of Relators' complaint, there were media reports about prescription compound cream schemes targeting TRICARE beneficiaries, and the excessive amounts being charged to TRICARE for expensive compounded scar and pain creams. *See* Tr. at 477:18-20; 479:22–481:2.[5] SA Champney recalled the FBI's concern over the media attention given to these

---

[5] The Government respectfully asks the Court to take judicial notice of the documents pre-marked as G-10, G-15, G-16, and G-17. Pursuant to Fed. R. Evid. 201(b), Courts may take judicial notice of newspaper and magazine articles. *United States ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006); *see also Holcomb v. McCraw*, 262 F. Supp. 3d 437, 449 n.3 (W.D. Tex. 2017). These articles are not offered to prove the truth of the matter asserted, but rather to show that compounding drug schemes targeting TRICARE, and TRICARE's steps to curtail the abuse, were in the media. *See, e.g.*, *Jacobs v. Bank*

11

compounding schemes while the investigation was covert. *Id*. at 477:18-20. He also testified about a CBS investigative report dated May 5, 2015, which found that American troops were being prescribed dubious drugs that were costing taxpayers hundreds of millions of dollars. *Id*. at 480:3-24; G-21.[6] Further evidence of media attention at the time includes a CBS news report dated February 23, 2015, involving the bilking of TRICARE for unwanted pain creams, *see* Exhibit Pre-Marked G-10,[7] and several publications by *The Military Times* identifying the Defense Department's plan to implement enhanced screening for ingredients used in compounded medications, effective May 1, 2015. *See generally* Exhibits Pre-Marked G-15, G-16, G-17.[8]

    c.  *Relators' Multiple Identical Qui Tam Actions*

One day after filing their complaint against Medworx, the same three Relators filed a *qui tam* action against another compounding pharmacy, InforMD, LLC, alleging the same general scheme of illegal commissions paid to 1099 marketers. Tr. at 331:12-16; s*ee* G-2 (Complaint, *United States ex rel. Westfall et al. v. InforMD, LLC*, *et al*., No. 3:15cv381-HTW-LRA (May 22, 2015)). Three months later, Relators filed yet a third *qui tam* action against another compounding pharmacy, Apothetech Rx Specialty Pharmacy, again alleging the same scheme of illegal commissions to 1099 marketers. Tr. at 331:17-20; s*ee* G-3 (Complaint, *United States ex rel. Westfall et al. v. Apothetech Rx Specialty Pharmacy Corp*., 3:15-cv-588-CWR-FKB (Aug. 14,

---

*of Am. Corp.*, No. 1:15-cv-24585-UU, 2017 WL 2361943, at *6 & n.2 (S.D. Fla. Mar. 21, 2017) (taking judicial notice of internet article for limited purpose of determining what statements were in the public domain, rather than the truth of those statements).

[6] *Available at* https://www.cbsnews.com/news/free-pain-meds-for-veterans-cost-taxpayers-big-bucks/.

[7] *Available at* https://www.cbsnews.com/news/investigation-insurance-billed-18000-for-unwanted-pain-meds/.

[8] *Respectively available at*: https://www.militarytimes.com/pay-benefits/military-benefits/health-care/2015/04/10/pharmacies-push-pricier-drugs-to-tricare-users/; https://www.militarytimes.com/pay-benefits/military-benefits/health-care/2015/02/02/agency-to-act-on-compound-med-reimbursements/; https://www.militarytimes.com/pay-benefits/military-benefits/health-care/2015/03/19/tricare-to-tighten-compound-drug-coverage/.

2015)).[9] In both the *InforMD* and *Apothetech* cases, upon learning that the Government did not intend to intervene, Relators voluntarily dismissed those actions. Tr. at 332:10–333:6. Unlike the present case, Relators were unaware of any criminal matters involving those defendants. *Id*.

      d.   *Relators' delayed pursuit of a Medworx judgment*

Following the Government's declination, Relators waited more than four years to file a motion for default judgment against Medworx. Relators instead focused their efforts on pursuing discovery from the Government about its criminal investigations in this district and elsewhere and filing multiple motions seeking millions of dollars from Spell's and Walters' criminal forfeiture.[10]

## IV.   Default Judgment Damages

During the damages hearing, Relators proffered expert testimony by Dr. Liesl Fox ("Fox"). Fox compared the data contained in various spreadsheets that Relators provided to her. First, Relators provided her with spreadsheets they obtained from Gaines, which Relators contend show commissions paid either by Medworx to CD Medical or by CD Medical to Hudson, Duke, Jimmy Collins, and Senn (collectively the "Commission Spreadsheets"). Tr. at 230:12-21. Fox had no personal knowledge of who created the commission spreadsheets, why they were created, how they were used, the accuracy of information, or where they were sent. *Id*. at 259:21–261:7. Fox compared the information in the Commission Spreadsheets to data in three separate spreadsheets obtained from TRICARE. The three TRICARE spreadsheets contain TRICARE prescription claims submitted by CFK/Medicine Shoppe, Medworx, and Sunflower. *Id*. at 231:13–232:1;

---

[9] A comparison of the Medworx, InforMD, and Apothetech complaints reveal that they even contain paragraphs with identical language but for the names of the defendant pharmacies. Tr. at 328:14-25–332:9; *see also* G-1, G-2, G-3.

[10] Following the Government's declination, Relators conducted limited discovery involving defendant Gaines and ultimately settled with Gaines in October 2022. Relators received a relator share in the amount of $1.9 million from that settlement.

234:9-13; 263:5-12; 264:7-13. By comparing the data in the Commission Spreadsheets to the data in the three TRICARE spreadsheets, Fox concluded that these three pharmacies together received $152,277,389.89 from TRICARE for claims she identified as matching entries on the Commission Spreadsheets. *Id.* at 247:3-9. Fox included every entry from the Commission Spreadsheets in her analysis, even though she did not understand the meaning of certain labels and codes associated with the various entries, such as "ID number" and "owner." *See id.* at 269:22–271:15.

As described, Fox did not limit her analysis to claims submitted by or paid to Medworx. Nor did she limit her analysis to claims that could be matched to Senn, who is the only 1099 marketer for which any commissions, prescriptions, or TRICARE claims are identified in Relators' complaint. The Government proffered expert testimony by John Ounsted ("Ounsted"), who matched the prescription information in the Commission Spreadsheets for Senn (excluding the other 1099 marketers included in Fox's analysis) with the TRICARE spreadsheets for Medworx (excluding the other pharmacies included in Fox's analysis). Ounstead concluded that TRICARE paid Medworx $13,198,380 for prescriptions that could be matched to Senn's commission spreadsheets. *Id.* at 374:6-19. Fox testified that she attempted to replicate Ounsted's analysis and agreed with his number as to relevant time period, with the exception of six claims (amounting to less than $85,000) that she believed Ounsted failed to include. *Id.* at 272:1–275:7.

**PROPOSED CONCLUSIONS OF LAW**

There are two separate issues for the Court to address:

(1) whether the FCA's "alternate remedy" provision entitles Relators to a relator share from criminal prosecutions against Spell and Walters, who are not defendants in this action and who will not be subject to any default judgment entered against Medworx, and

(2) the amount of FCA damages to be entered against defaulted defendant Medworx, from which Relators will receive a relator share award.

Section I below explains that the Spell and Walters criminal prosecutions were not alternate remedies for this *qui tam* action, and Relators are not entitled to a relator share based on those prosecutions. Section II explains that, even if the Court concludes the Government pursued an alternate remedy,[11] the Court should limit its decision to the amounts seized from Medworx and actually recovered by TRICARE. Relators may not share in amounts that would not be recoverable in their own *qui tam* action. No individual or entity other than Medworx will be subject to a judgment in this case. Section III addresses the proper scope of any default judgment entered against Medworx in this action. And Section IV explains what the proper relator share award in this case should be from the proceeds of any default judgment entered against Medworx.[12]

I.      **Relators Cannot Receive a Relator Share Based on the Criminal Prosecutions, Because Those Prosecutions Were Not Alternate Remedies Under the FCA.**

The Court previously found that the Government's criminal prosecutions of two non-*qui tam* defendants (Spell and Walters) constituted an "alternate remedy" to this *qui tam* case. *See* ECF No. 188 at 2 ("The government pursued an 'alternate remedy' when it had this case stayed and commenced civil asset forfeiture and criminal cases against Medworx's owners."). At that time, however, the Court did not have the full benefit of the present record, which shows that the Government did not pursue the criminal prosecutions as an alternative forum for Relators' claims. The Government's pre-existing and independent criminal investigations did not stem from Relators' information or complaint, and the criminal prosecutions encompassed conduct that Relators never alleged and knew nothing about. The record does not support a conclusion that the

---

[11] The Government respectfully acknowledges the Court's prior statement that "the government pursued an 'alternate remedy.'" ECF No. 188 at 2. As discussed below, however, the Government urges the Court to reconsider its conclusion in light of the record from the evidentiary hearing and the Fifth Circuit's intervening decision in *United States v. Conyers*, 108 F.4th 351 (2024).

[12] The Government also preserves and incorporates the arguments urged in its prior briefing on these issues. *See* ECF Nos. 71, 180, 187, 193, 208.

Government learned about Relators' allegations and then used the criminal cases to "siphon[] for itself the assets the whistleblowers alerted [it] to." *Id.*

Additionally, at the time of the Court's March 18, 2024, Order, the Court also did not have the benefit of the Fifth Circuit's decision in *United States v. Conyers*, 108 F.4th 351 (2024). *Conyers* made clear that a *qui tam* relator is limited to a share of the "claims" brought by the relator. The Fifth Circuit also explained that the FCA's alternate remedy provision does nothing to alter this bedrock principle. Under the alternate remedy provision, a relator "receives the share he 'would have had' if the Government had intervened under § 3730(d)(1)." *Conyers*, 108 F.4th at 358 (discussing "equivalence of recovery required by" alternate remedy and relator share provisions (quoting *United States ex rel. Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 373 (8th Cir. 2015) (en banc))).

In the present case, had the Government intervened in Relators' action, it could not have pursued an FCA judgment against Spell or Walters for the conduct pursued in the criminal cases without adding claims against them. Under *Conyers*, Relators would not be entitled to a share of the Government's recovery on those additional claims. 108 F.4th at 359 (relator may not share in "additional claims added by the Government" upon intervention). The same is true here, where Relators seek a share under an "alternate remedy" theory. To hold otherwise would mean that the alternate remedy provision gives Relators greater rights than they have in their *qui tam* action.

## A. Relators Did Not Bring Claims Against Spell or Walters

Relators did not file a *qui tam* action against either Spell or Walters. Neither Spell nor Walters is named as a defendant in the caption of this case. Nor are they referenced anywhere in Relators' complaint. This alone is dispositive. It is without question that Relators did not bring claims against Spell or Walters, who will not be subject to the default judgment entered against

16

Medworx.[13] *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties[.]"); *In re Natural Gas Royalties Qui Tam Litig.*, 566 F.3d 956, 962 (10th Cir. 2009) ("The identify of a defendant constitutes a material element of a fraud claim . . . ."). Accordingly, the FCA does not entitle Relators to share in any recoveries from Spell or Walters. *Conyers*, 108 F.4th at 359 (relator may only share in recovery of the "'claim' he brought"); *accord Rille*, 803 F.3d at 373 (Relators' entitlement to share in the "proceeds of the action" means "the action as brought by the relator").

## B. Relators' AKS Claims Were Not Resolved in the Criminal Proceedings.

Relators' complaint is premised solely on alleged violations of the AKS. Relators claim that Medworx paid commissions to Senn, as well as an unknown number of other unnamed 1099 marketers. Relators allege that these commissions were designed to induce Senn to solicit physicians to write prescriptions for Medworx products, and to solicit and recommend that soldiers obtain prescriptions for Medworx products.

In contrast, Spell and Walters did not plead guilty to AKS charges.[14] Rather, they pled to a wide-ranging health care fraud conspiracy including: formulating compound drugs and substituting ingredients to maximize insurance reimbursements, mass producing compound drugs without identifying the needs of individual patients, waiving patient co-payments and fraudulently concealing the waiver of those co-payments, and payments to physician prescribers. *See infra*

---

[13] It is black letter law that a corporate owner is not personally liable for a corporation's conduct solely because of their ownership. *See* Miss. Code Ann. § 79-29-311.

[14] Relators argue that Walters' Superseding Indictment included AKS charges for payments made to CD Medical. *See* Tr. at 411:18–412:7. Relators' reliance on the Walters indictment is misplaced. *Conyers* makes clear that it is the conduct resolved, not the conduct initially pled, that matters when determining Relators' entitlement to share in a recovery. In *Conyers*, the Government filed a complaint in intervention that included claims initially brought by the relator as well as additional claims added by the Government. 108 F.4th at 354. The Government subsequently dropped its pursuit of the relator's claims and ultimately settled only the claims added by the Government. *Id.* at 355. Even though the Government initially intervened in relator's action, the relator was not entitled to a share of the recovery because the settlement was not for relator's claims. *Id.* at 359.

Table 1. Their fraud involved numerous pharmacies and other entities not at issue in Relators' complaint. *Id.* Walters also pled guilty to money laundering. *Id.*

Relators incorrectly contend that they need only show some factual overlap between their case and the criminal cases. *See, e.g.*, ECF No. 185 at 4 n.4. Relators highlight that the criminal conspiracies included bribes paid to marketers to further Spell's and Walters' fraud. But the Fifth Circuit in *Conyers* noted that it has not adopted a simple factual overlap test. 108 F.4th at 359. Moreover, as the Fifth Circuit explained, even in courts where a factual overlap test has been adopted for purposes of determining entitlement to a relator share, it is intended to ensure that the claim for which a share is sought is the same claim that the relators brought to the Government's attention.[15] *See id.* at 359-60 & n.9. Ultimately, it is the "nature of the legal claim" that matters, not mere commonality of facts. *United States ex rel. Kennedy v. Novo A/*S, 5 F.4th 47, 57 (D.C. Cir. 2021); *see also United States ex rel. Kuriyan v. Molina Healthcare of New Mexico, Inc.*, No. CIV 16-1148 JB/KK, 2024 WL 4002950, at *17 (D.N.M. Aug. 30, 2024) ("[A]lthough factual similarity can be important, it is not enough to seal the deal." (internal citations and quotation marks omitted)).

Relators have not satisfied this test. First, Relators' failure to assert claims against, or allege any conduct by, Spell and Walters fails the "factual overlap" test. *See United States ex rel. Rille v. PricewaterhouseCoopers, LLP*, No. 4:04-cv-988, 2017 WL 11683682, at *3 (E.D. Ark. Feb. 8, 2017) (no "factual overlap" as to non-*qui tam* defendant who was "never mention[ed]" in the complaint). Further, Relators did not bring claims alleging the same fraud resolved by the criminal

---

[15] Some provisions in the FCA look to whether a *qui tam* action is based on the same facts or allegations described elsewhere. *See, e.g.*, 31 U.S.C. § 3730(b)(5) (first-to-file provision barring *qui tam* actions that are "based on the facts underlying" a previously filed *qui tam* case); *id.* § 3730(e)(4)(A) (public disclosure bar precluding claims where "substantially the same allegations or transactions" were publicly disclosed). The alternate remedy provision, however, does not. It refers to a relator's rights with respect to their "action" or "claim"—not other actions or claims based on the same or similar facts.

pleas. Relators' claims are grounded solely on a theory that Medworx engaged in an illegal pyramid scheme. Their complaint is based on allegations that money flowed from Medworx to Marketer A to Marketer B to Marketer C and so forth. *See* G-1 ¶¶ 37-53. This is the scheme Relators repeatedly sought to establish during the damages hearing.[16] The criminal cases were very different, as demonstrated in the table below ("Table 1").

| **What Did Relators Plead?** | **What Do Relators Seek a Share Of?** |
|---|---|
| Civil case against Medworx Pharmacy | Criminal cases against Spell and Walters |
| Claims predicated solely on AKS violations by Medworx. (*See generally* G-1) | Restitution and forfeiture resulting from guilty pleas to health care fraud and money laundering, involving multiple pharmacies and other entities owned or operated by Spell and Walters:<br><br>• Medworx<br>• CFK/Medicine Shoppe<br>• Sunflower<br>• AMI Pharmacy<br>• Advantage Pharmacy<br>• Southern Compounding<br>• Prime Care Marketing<br>• Total Care Marketing<br>• Innovative Management Solutions<br>• Walters Consulting, Inc.<br>• Intellectual Property Management Services, LLC<br><br>(*See* Tr. at 491:6–492:2; Walters Plea Tr. at 27, 29-34) |

---

[16] During the hearing, Relators' counsel created a hand-drawn demonstrative depicting a "pyramid" of payments flowing from Medworx ("A") to "B" to "C" and so on. *See* R-69. Relators appear to contend they are entitled to a share of any Government recovery from entities or individuals who can be plugged into that chart, regardless of whether Relators knew anything about those specific entities or individuals or the actual conduct serving as the basis for the Government's recovery.

| **What Did Relators Plead? (cont.)** | **What Do Relators Seek a Share Of? (cont.)** |
|---|---|
| Claims predicated on AKS violations limited to specific allegations about:<br><br>• Commissions paid from Medworx to marketer Brian Senn (*See* G-1 ¶¶ 38-53; Tr. at 323:1–327:24)<br><br>• 3 Medworx prescriptions procured by Bourland (*See* G-1 ¶¶ 47-51) | Restitution and forfeiture resulting from guilty pleas based on conduct including:<br><br>• Altering compound drug formulas and substituting ingredients to drive up TRICARE reimbursement<br><br>• Mass production of compounded medications that were not tailored to the needs of individual patients, and without regard to medical efficacy<br><br>• Payments to physician prescribers<br><br>• Payments to marketers to obtain medically unnecessary prescriptions<br><br>• Waiver of co-payments for beneficiaries<br><br>• Elaborate schemes to conceal co-payment waivers<br><br>• Money laundering<br><br>(*See* R-13 at 20-23; Walters Plea Tr. at 24-35) |

As the chart clearly demonstrates, the criminal cases against Spell and Walters were not simply based on a pyramid scheme involving 1099 marketers, Medworx, Gaines, or Senn. Relators do not, and cannot, establish that "the claim for which recovery is sought is one that the relator himself actually brought to the government's attention." *Conyers*, 108 F.4th at 359 (cleaned up); *see also United States ex rel. Estate of Turner v. Gardens Pharmacy, LLC (Gardens I)*, No. 1:18-cv-338, 2022 WL 2079718, at *4 (S.D. Miss. June 9, 2022) (no alternate remedy where "Relator alleged, at most, a scheme loosely related to the one the Government prosecuted" but "the parties and the alleged activities are plainly not the same and the overlap, if any, is minimal").

If Relators knew about the individuals and conduct pursued in the criminal cases, they could have included those claims and allegations in their original complaint or filed an amended complaint. They did not. On the other hand, if Relators were to amend their complaint now to add

those claims, they would be barred by the FCA's public disclosure bar.[17] Relators cannot use the alternate remedy provision to circumvent that bar and undermine the carefully crafted provisions in the *qui tam* statute. *See Conyers*, 108 F.4th at 358 (declining to create "unwarranted disparit[y]" between relator share and alternate remedy provisions (alteration in original)).

Moreover, the criminal prosecutions of Spell and Walters "did not settle [the Relators'] claims." *Conyers*, 108 F.4th at 360; *see also United States ex rel. Babalola v. Sharma*, 746 F.3d 157, 161 (5th Cir. 2014) (alternate remedy provision assumes the *qui tam* action did not continue). To the contrary, Relators were entitled to pursue their claims. Relators executed an FCA settlement with defendant Gaines, from which they received a $1.9 million relator share. Relators were also entitled to pursue claims against Medworx, although they waited four years following the Government's declination to move for a default judgment. Relators posit that Medworx can no longer pay a judgment.[18] But even if true, this does not give Relators a right to share in recoveries for other claims or from other entities and individuals. The FCA's *qui tam* provision does not operate as a guarantee by the Government that the relator will ultimately receive some bounty.

### C. Relators' Catalyst Theory Is Legally and Factually Flawed

Relators have argued that their complaint spurred the criminal investigation. They are wrong as a matter of fact. Moreover, under *Conyers*, this is irrelevant as a matter of law.

#### 1. Relators' information was not a catalyst in the criminal cases.

Relators incorrectly contend that they were responsible for alerting the Government to Medworx's fraud. It is without dispute that the FBI opened an investigation of Medworx, Spell,

---

[17] Under the public disclosure bar, a relator's claims are generally barred if they are based on public information, unless the relator qualifies as an "original source." *See* 31 U.S.C. § 3730(e)(4)(A).

[18] Although Relators ask the Court to assume they will be unable to collect on a judgment in this case, they have failed to establish this through evidence. The only evidence they presented regarding Medworx's status is that it submitted annual reports to the Mississippi Secretary of State as recently as 2024. *See* R-30.

Walters, and other entities and individuals as early as February 3, 2015—months before Relators filed their complaint or provided any information to the Government. *See* Tr. at 466:13-22; 495:12-16. Moreover, the FBI had already been investigating Walters since at least January 2015 in connection with Advantage Pharmacy. *Id*. at 469:9-20. The FBI opened its Medworx investigation based on a referral from the MS AG regarding potential kickbacks to prescribers and patients, commissions being paid to marketers, lack of patient/doctor relationships, and the fraudulent waiver of patient copayments. *Id.* at 467:3-21. In early 2015, before Relators' complaint was filed, the government also began investigating yet a third compounding pharmacy associated with Walters—World Health. *Id*. at 470:8-17. And in March 2015, DCIS received a referral from DHA based on a hot-line tip about compounding prescriptions filled by CFK/Medicine Shoppe, a Utah pharmacy owned by Spell and Walters. *Id.* at 641:4-21; 646:2-4; 675:25–676:2.

Relators conceded during the hearing that they did not bring any information to the Government until the filing of their complaint on May 21, 2015. Tr. at 316:21-23. And there is nothing in the record to refute the fact that the Government's criminal investigations were carried out independent from Relators' *qui tam* complaint. The criminal investigations began before the Relators' complaint was filed, and they proceeded as they would have had the *qui tam* case never been filed. Relators have failed to establish that the extremely limited information in their complaint, about a single alleged marketer and three prescriptions procured by Relators, contributed in any way to the prosecutions of Spell and Walters. Although Government agents spoke with Bourland's stepbrother and the nurse practitioner who signed his prescriptions, that information did not lead to further developments in the investigation. *See id.* at 490:6-11.

Tellingly, Relators did not rely on their own knowledge to demonstrate the utility of their information to the Government—or even to prove up default judgment damages at the hearing.

22

Relators never sought to introduce their own testimony. It was the Government that called Bourland as a witness. The reason for this is clear: Bourland's testimony confirmed that Relators' minimal knowledge (limited to the sparse allegations in the complaint) does not support the massive judgment or relator share award they now seek. Instead, Relators' evidence at the hearing focused on public filings from Government prosecutions as well as documents, information, and testimony obtained through discovery. For example, Relators introduced bank statements; marketer commission reports; checks; evidence of commissions from Medworx to CD Medical; information about CFK/Medicine Shoppe and Sunflower; evidence about marketers, patients, and doctors; and information about Walters and Spell. But Relators neither possessed nor provided to the Government any of this information when they filed their complaint or during their interviews with investigators. To the contrary, they were alerted to much of this information *from* the Government's criminal pleadings and their discovery in this case.

During the hearing, Relators repeatedly focused on the fact that the Government did not prosecute Senn or Gaines—the individuals actually identified in Relators' complaint. *See* Tr. at 129:4–130:20; 537:1–540:8; 556:15–557:3. Relators also questioned the Government's agents as to why they did not enlist Relators to assist with the investigation. *See id.* at 536:8-11. It is not clear what Relators hope to show from this. Contrary to Relators' arguments, this only highlights that the Government did not use the criminal prosecutions as an alternate forum to pursue the information actually brought by Relators. Rather, it pursued prosecutions stemming from its own independent criminal investigation.

Faced with this fact, Relators essentially argue that once their case was filed, the Government had an obligation to change course in the existing criminal investigation. In essence, they contend that the Government *should* have used their information to prosecute the criminal

cases differently and in a way that matched their complaint. This is not required by the statute, it would hamper the Government's law enforcement efforts, and it would have notable constitutional implications. *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (decision not to indict "has long been regarded as the special province of the Executive Branch"). In any event, it is not what the Government did here. And *Conyers* makes clear that where the case pursued by the Government is not the case brought by the Relators, Relators have no right to a share.

### 2. The Fifth Circuit has rejected a catalyst theory.

In light of the actual evidence, Relators are left to speculate that although the Government had "started scratching the surface" before their complaint was filed, Relators nonetheless spurred the Government's investigations in some way. *See* Tr. at 12:15-18. Relators have established no evidence of this. But even if Relators' unsupported speculation were correct, this would not entitle them to a share based on the criminal proceeds. As the Fifth Circuit has stated: "Whatever the merit of this [catalyst] theory as a policy matter, it is not derived from the statute." *Conyers*, 108 F.4th at 360 (quoting *Rille*, 803 F.3d at 374). Relators are limited to a share of the recovery of "the claim that [they] brought." *Id.* (cleaned up).

### D. The Government Did Not "Elect" an Alternate Remedy by Commencing a Criminal Investigation Before Relators' Complaint Even Existed.

The alternate remedy provision permits the United States to "elect to pursue" a relator's claim "through any alternate remedy available to the Government." 31 U.S.C. § 3730(c)(5). This affords the Government flexibility in choosing the forum in which to pursue a relator's claims while protecting the relator's rights with respect to those claims. The Government cannot "elect" an alternate forum for a relator's claims when the relator's action does not yet exist. Thus, the Fifth Circuit has recognized that where the Government commences a course of action before a *qui tam* case exists, there is no alternate remedy. *See Babalola*, 746 F.3d at 162 (criminal proceeding

24

commenced before *qui tam* case was not an alternate remedy). Other courts of appeal have reached the same conclusion. *United States ex rel. Guardiola v. Renown Health*, 845 F. App'x 707, 708 (9th Cir. 2021) (alternate remedy must be chosen "after a relator files her *qui tam* complaint"); *see also United States v. L-3 Commc'ns EOTech, Inc.*, 921 F.3d 11, 30 (2d Cir. 2019) (alternate remedy provision only applicable "if the relator's *qui tam* action was pending when the government was choosing what course to pursue"). Even the cases on which Relators rely are consistent with this conclusion. *See United States v. Bisig*, No. 02-cr-112, 2005 WL 3532554, at *1, 4 (S.D. Ind. Dec. 21, 2005) (relator "was first to uncover the fraudulent activities and report them to the United States" and Government subsequently opened a criminal investigation based on that information).

Relators' theory would require the Court to conclude that the Government "elected" an alternate remedy at one of three stages: (1) by commencing the criminal investigation, (2) by not terminating that investigation once Relators' complaint was filed, or (3) by pursuing criminal charges against Spell and Walters stemming from that pre-existing investigation. None of these have merit. First, as in *Babalola*, the Government began its criminal investigation before Relators' complaint existed. Second, there is no precedent to conclude that the Government "elected" an alternate remedy by not terminating the criminal investigation once the Relators' case was filed. Third, focusing solely on when the criminal indictments were filed would lead to absurd results. Under that theory, an indictment filed the day before a *qui tam* complaint would not be an alternate remedy, but an indictment filed one day later would be. In both scenarios—as in the present case— the Government chose a course of action prior to the relator's case. And the Government proceeded with that course of action in its normal course, independent from the relator's case.

*Guardiola* is illustrative. There, the Government's audit contractor began continuous audits of the *qui tam* defendant before the relator's case was filed. *Guardiola*, 845 F. App'x at 708. The

audits continued after the *qui tam* was filed and the government declined to intervene. *Id.* The district court found that the audit recoupments post-dating the relator's complaint were an alternate remedy. *United States ex rel. Guardiola v. Renown Health*, 442 F. Supp. 3d 1319, 1326 (D. Nev. 2020). The Ninth Circuit reversed, explaining that the Government did not elect an alternate remedy by allowing the audits to continue after the *qui tam* was filed. *Guardiola*, 845 F. App'x at 708 & n.2. The same is true here. The Government did not elect an alternate remedy by permitting its criminal investigation (and resulting prosecutions) to continue after the *qui tam* was filed.[19]

### E. Awarding a Relator Share Based on the Criminal Prosecutions Would be Contrary to the Purpose of the *Qui Tam* Provision.

Relators' arguments "fight[] against the FCA's purposes." *Conyers*, 108 F.4th at 358. First, Relators seek to garner credit for the Government's massive independent criminal investigation in which Relators played no role. The Fifth Circuit's decision in *Conyers* rejects the notion that Relators are entitled to share in the recovery of claims that they never brought and that they had nothing to do with. *See id.* at 358.

Second, there is no reason to stretch the alternate remedy provision in this case beyond its intended scope. Relators have already received a relator share of more than $1.9 million based on the claims they actually brought. What Relators now seek is to share in $70 million that they believe the government seized from individuals and entities who are not defendants in Relators' complaint and who would not be subject to a judgment in this case.

---

[19] Relators contend that the Government is attempting to revive the now-repealed "government knowledge" bar. *See* Tr. at 12:10-15. Not so. The Government does not contend that Relators' action is barred because of the pre-existing criminal investigation. The Government has not sought to dismiss this case, and Relators pursued, settled, and received a share of their claims against Gaines. But the Government does not "elect" an alternate remedy by continuing to pursue a pre-existing criminal matter after a *qui tam* complaint is filed.

Third, the FCA is intended to reward whistleblowers who alert the Government to fraud and assist in recovering funds for the public fisc. Its purpose is not to incentivize Relators who engage in fraud as an opportunity to file a *qui tam* suit. *Cf.* 31 U.S.C. § 3730(d)(3) (providing for reduction in relator share where "the action was brought by a person who planned and initiated the [FCA violation] upon which the action was brought"). Relators' version of events suggests this is what they did here. Bourland testified that within 24 to 48 hours of learning about Senn's conduct, Relators determined it was fraudulent and "incredibly illegal." Tr. at 336:15–337:5. Yet they did not alert the Government. They solicited Bourland's stepbrother to accept Medworx prescriptions for which Bourland received a commission of at least $10,250.99—costing TRICARE more than $180,000. *Id.* at 323:24–324:12; R-19 ("Paid_Amt" in Paid Claims tab for all claims associated with prescriptions with "Bene_Name" M. Spears and "Write_Dt" 1/23/2015). Their apparent goal was to generate evidence for a *qui tam* case. Tr. at 313:9-11 ("24-48 hours [after speaking with Senn], we started looking into what the False Claims Act and all of these things say[.]"); *id.* at 314:9-15 ("We knew that was illegal, but we just wanted to be able to prove it."); *id.* at 10:12-16 (statement by Relators' counsel that "we are obligated to develop specific evidence of a kickback that produced a false claim to the government. *So our relators did that . . . .*" (emphasis added)).[20]

Worse yet, Relators are using their barebones complaint based largely on their own conduct to claim credit for recoveries they had nothing to do with. They seek to divert millions of dollars, which will otherwise be available to compensate the very victims of Spell's and Walters' crimes, as a windfall for themselves. This is paradoxical to the FCA. *Cf. Webster v. United States*, No. 99-

---

[20] Even after Bourland received a commission check on March 2, 2015, Relators did not alert the Government. Rather, it was not until May 21, 2015—after media reports began to appear about compound drug schemes targeting TRICARE, and TRICARE reimbursement changes being made to stem TRICARE's compound drug costs—that Relators filed their complaint. Tr. at 316:21-23.

27

1485, 2000 WL 962249, at *3 (4th Cir. July 12, 2000) ("As we and numerous other courts have observed, the history of the FCA *qui tam* provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior." (cleaned up)).

This case is materially different from the outlier cases upon which Relators have relied. For example, in *Bisig*, the court found a criminal prosecution to be an alternate remedy where the relator was first to alert the Government to the defendant's fraud, and the Government then pursued a criminal investigation. 2005 WL 3532554, at *1, 4. In *United States v. Najjar*, the court awarded relator a share of a civil settlement with a non-*qui tam* defendant. 120 F. Supp. 3d 1322, 1323-24, 1327 (M.D. Fla. 2015). But there, the court recognized it was presented with an "(unusual) factual circumstance" where it was the relator who brought the fraudulent conduct to the Government's attention, the relator specifically identified the non-*qui tam* defendant in the complaint, and he "described a number of ways he participated in the scheme." *Id.* at 1326-27. Those facts are not present here.[21]

## II.    If the United States Pursued an Alternate Remedy, It Is Limited, at Most, to Amounts Recovered from Medworx and Recovered by TRICARE.

If the Court concludes that the Government pursued an alternate remedy, any relator share must be based on amounts that were seized from Medworx and recovered by TRICARE. The only assets seized from Medworx during the criminal investigation amounted to $2,507,549.04. Tr. at 700:1–701:21; 703:24–704:6; 705:13-18; G-4–G-7. All other assets were seized from other individuals and entities who will not be subject to an FCA judgment entered in this action. *Id.*

---

[21] For similar reasons, the present case also differs from the recent decision in *United States ex rel. Birchall v. SpineFrontier, Inc.*, No. 15-12877-LTS, 2024 WL 4686985 (D. Mass. Nov. 4, 2024). There, the court concluded that Relators' complaints "identified every single Settling Surgeon by name and described the fraudulent conduct presented in the settlement agreements with some degree of specificity." *Id.* at *6 & n.7.

28

Moreover, it is a bedrock principle of the FCA that a relator's share is derivative of a *recovery* by the Government for the damages asserted in Relators' complaint. Forfeiture is not remedial in nature and does not represent a recovery by a federal agency. *United States v. Sanjar*, 876 F.3d 725, 750-51 (5th Cir. 2017) (explaining that forfeiture and restitution serve different purposes, even where the government is the sole victim, and a court cannot offset restitution obligations with forfeiture proceeds). For this reason, criminal forfeiture cannot itself be an alternate remedy. At most, Relators may only receive a share of whatever portion of the Medworx-seized assets are ultimately recovered by the federal victim agency (TRICARE).[22]

Relators' share of any alternate remedy recovery should be limited to 15 percent. Where a relator share is awarded under the alternate remedy provision, the relator share range for intervened cases should apply. *See Conyers*, 108 F.4th at 358 (under the alternate remedy provision, a relator "receives the share he 'would have had' if the Government had intervened under § 3730(d)(1)"). Section 3730(d)(1) provides for a relator share between 15 and 25 percent "depending upon the extent to which the person substantially contributed to the prosecution of the action." As discussed, Relators did not contribute to the criminal prosecutions. Thus, should the Court conclude that the Government pursued an alternate remedy, Relators are limited to a 15 percent share.

### III.   Default Judgment Against Medworx Must Be Supported by Relators' Complaint.

The judgment entered in this case must be for the claims in Relators' complaint and supported by Relators' well-pled allegations. Relators instead attempt to obtain an enormous judgment of $730 million, which they base on the restitution awarded in the Spell and Walters criminal prosecutions.[23] Relators do not seek this massive judgment because they intend to collect

---

[22] To the extent TRICARE recovers any of these assets, it will be through DOJ's remission or restoration process, through which forfeited funds can be distributed to compensate victims of a defendant's crimes.

[23] Because the FCA provides for treble damages, Relators multiply Spell's criminal restitution by three.

anything for the United States. Rather, it is yet another effort to obtain a share of the criminal proceeds. This is improper. The Court must award a judgment based on Relators' complaint against Medworx. Relators bear the burden of proof to demonstrate damages. *EEOC v. Workplace Staffing Sols.*, No. 1:15CV360-LG-RHW, 2016 WL 3676656, at \*2 (S.D. Miss. July 7, 2016) (plaintiff must establish damages by hearing or detailed affidavits establishing necessary facts).

### A. Damages in This Case Should Be Limited to Claims Billed by Medworx.

Relators cannot obtain a judgment encompassing claims submitted by pharmacies other than Medworx. Their complaint does not contain any allegation pertaining to other pharmacies, including CFK/Medicine Shoppe or Sunflower. They did not allege that Medworx used other pharmacies to submit claims to TRICARE. They did not allege that Medworx operated or controlled other pharmacies. They did not allege that Medworx caused other pharmacies to submit false claims. And they did not allege that money flowed between Medworx and other pharmacies, or that Medworx paid commissions to marketers on behalf of other pharmacies. To the contrary, Relators' complaint is explicitly limited to claims submitted by Medworx. *See* G-1 ¶ 2 (allegations "involve fraudulent billing by Medworx"); *id.* ¶ 34 (TRICARE "reimburses Medworx for these prescriptions"); *id.* ¶ 55 (alleging liability for "claims presented by Medworx").

It is evident that Relators had no knowledge of conduct involving other pharmacies. The FCA requires relators to provide the government with a written disclosure of all material information the relator has about their claims. 31 U.S.C. § 3730(b)(2). Relators did so here. Tr. at 304:8-14; 320:6-10. Bourland admitted that his disclosure statement does not contain a single reference to CFK/Medicine Shoppe, Sunflower, or any other pharmacy. *Id.* at 320:21–321:1. And the disclosure statements submitted by Relators Westfall and Lesley merely parrot Bourland's. *See* G-13, G-19. A relator cannot recover for misconduct "about which he knew nothing and played no

30

role in uncovering." *See United States ex rel. Smart v. CHRISTUS Health*, No. 2:05-cv-287, 2013 WL 2289883, at *4 (S.D. Tex. May 22, 2013), *aff'd*, 563 F. App'x 314 (5th Cir. 2014).

Moreover, because allegations involving other pharmacies are not in the complaint, Medworx has not been deemed liable for such conduct as a result of the default judgment. *See Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law."). Medworx had no notice that the consequence of its default would be a judgment encompassing allegations that Medworx not only submitted false claims, but also caused *other* pharmacies to submit false claims. *See Ditech Fin., L.L.C. v. Naumann*, 742 F. App'x 810, 813 (5th Cir. 2018) (reason for Rule 54(c) is "to ensure a party pondering default has meaningful notice, based on the complaint alone, of her exposure in the event of default").

Relators use the Government's public filings in other cases, Dedric Mitchell's testimony, and other evidence obtained during discovery to expand damages beyond their complaint. This is improper. It may be true that Medworx could be liable for causing other pharmacies to submit false claims. But those are not the allegations in Relators' complaint. Any effort to expand their complaint must be done through an amendment. This is particularly important in the default judgment context, where a defendant must have meaningful notice of their exposure from default. *Id.* This issue is compounded in the FCA setting, where Rule 9(b), the FCA's public disclosure bar, and other statutory requirements might prevent a relator from expanding their complaint. *See United States ex rel. Estate of Turner v. Gardens Pharmacy, LLC (Gardens II)*, No. 1:18-cv-338, 2022 WL 17824009, at *5-7 (S.D. Miss. Dec. 20, 2022) (court rejected relator's attempt to pursue unopposed summary judgment for conduct that expanded the scope of relator's complaint, citing Rule 9(b) and public disclosure bar concerns). Indeed, any amendment to add claims involving

31

CFK/Medicine Shoppe or Sunflower would be subject to the public disclosure bar, as is clear from Relators' reliance on publicly filed documents. Relators cannot overcome these important substantive and procedural requirements by simply ignoring them.

### B.  Damages in This Case Should Be Limited to Claims Tied to Brian Senn.

Damages in this case must also be limited to claims tied to Senn. FCA claims must comply with Rule 9(b)'s requirement that "a party must state with particularity the circumstances constituting fraud or mistake." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Further, in the default setting, Medworx has not been determined liable for allegations beyond those in the complaint. *See Nishimatsu*, 515 F.2d at 1206.

The specific allegations in Relators' complaint relate exclusively to commissions paid by Medworx to Senn. The complaint references only three prescriptions allegedly billed to TRICARE. G-1 ¶¶ 47-49. Relators allege that Senn received a commission for these prescriptions, and that he paid a portion of that commission to Bourland, who recruited his stepbrother to obtain the prescriptions. *See id*. The complaint alleges some detail about other commissions paid to Senn. *Id*. ¶¶ 46, 52-53. But it does not include specific allegations about any other 1099 marketers; who they were; what kickbacks they received; what Medworx products were prescribed; or when, by whom, or for whom such products were prescribed. *See* Tr. at 323:1–327:24.

Relators seek a judgment based on all commission payments from Medworx to CD Medical. But Relators' complaint does not include any allegations about CD Medical. And although Relators named Gaines as a defendant in this case, their complaint does not allege a single kickback paid to Gaines, a single claim tied to such a kickback, Gaines' relationship with any physicians or patients, or any details relating to Gaines. Tr. at 326:21-23 (admitting that "apart from the commissions paid to Senn, there's no reference to any other conduct by Medworx"); *id.*

at 323:1–326:23 (acknowledging complaint does not tie any payment to Gaines). The complaint contains just one specific reference to Gaines in discussing the fraudulent scheme, and it is limited to a conclusory allegation that he "recruited" Senn "into the fraudulent scheme." G-1 ¶ 39.

In sum, a judgment based on commission payments to CD Medical or Gaines cannot be traced back to the properly pled allegations in the complaint. *See Gardens II*, 2022 WL 17824009, at *5-7 (court rejected relator's effort to expand AKS claims and damages to include commissions to twelve additional sales agents when only six were specifically identified in complaint); *see also United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 523 (6th Cir. 2007) (general allegations of upcoding paired with specifically pled allegations relating to single DRG code did not entitle relator to recover for conduct involving other DRG codes).

### C. Relators Cannot Rely on the Spell Restitution Order.

Relators cannot rely on Spell's criminal restitution order as the basis for civil damages in this case. Using criminal restitution as a basis for FCA damages is only appropriate where the restitution amount is for the same fraudulent conduct. *See United States ex rel. Carver v. Physicians Pain Specialists of Ala., P.C.*, No. 22-13608, 2023 WL 4853328, at *7 (11th Cir. July 31, 2023) ("[Relator] sought to adopt the criminal restitution figures as her civil damages without any effort to tailor them, even though it's undisputed that the restitution included losses from schemes that were not included in the *qui tam* case."); *United States ex rel. Chepurko v. e-Biofuels, LLC*, No. 1:14-cv-00377-TWP-MJD, 2020 WL 2085071, at *8 (S.D. Ind. Apr. 30, 2020) (calculating FCA damages based only on portion of restitution that overlapped with conduct alleged in *qui tam* complaint); *cf. Gardens I*, 2022 WL 2079718, at *3-4 (conduct alleged in complaint regarding commission payments to marketers was different from criminal cases focused on substitution of more profitable compounds that were not medically necessary).

Relators' own evidence confirms that the Spell restitution order encompassed loss to TRICARE from conduct involving pharmacies other than Medworx. *See* R-13 at 20-23 (referring to "pharmacy 1" and "other pharmacies"); R-32 ¶¶ 2-3 (Spell declaration stating that plea encompassed multiple pharmacies). SA Champney confirmed that Spell's restitution was calculated based on claims from four different pharmacies. Tr. at 491:6–492:2; 492:25–493:2. Moreover, Relators do not demonstrate what—if any—portion of the restitution amount relates to claims that had any connection to Senn. Spell did not plead guilty to AKS violations premised on commission payments to Senn. And SA Champney testified that Spell's restitution was not calculated by identifying claims tied to marketer commissions. *Id.* at 492:7-13. Rather, the criminal restitution encompassed all claims tied to Spell's fraud. *Id*. at 492:3-24.

Relators skirt these issues by presenting a conclusory declaration by Spell, whom Relators did not present to give live testimony. Spell's declaration simply states that commissions were paid for "all, or virtually all," of the prescriptions at issue in the criminal plea, and that if any prescriptions were filled without commissions, "it would have been very few." R-32 ¶ 4. It does not identify what portion of the restitution relates to *Medworx* prescriptions marketed by *Senn*. Further, Relators offer no evidence as to what portion of the $243 million constitutes "virtually all" or "very few." This generalized, conclusory, and untested declaration cannot support a $730 million default judgment that far exceeds the scope of the actual allegations in Relators' complaint.

### D.  Damages Tied to Medworx and Senn

Relators do not even attempt to establish a damages amount based on TRICARE claims paid to Medworx and tied to Senn. The Government's expert, John Ounsted, reviewed the TRICARE claims data and Commission Spreadsheets that Relators rely upon in this case. He determined that Medworx was paid $13,198,380 for claims that could be matched to Senn's

Commission Spreadsheets. Tr. at 374:6-19. Relators' expert testified that she reviewed this number and largely agreed with it. *Id.* at 272:1–275:7. Any damages award against Medworx must be based, at most, on the approximately $13.2 million in Medworx claims attributed to Senn.

IV.     **Any Relator Share Must Be Paid from the Proceeds of the Default Judgment.**

Any relator share in this case must be paid out of the proceeds of the default judgment against Medworx. 31 U.S.C. § 3730(d)(2) (relator "shall be paid out of [the] proceeds" of their action). The relator share percentage is governed by 31 U.S.C. § 3730(d)(2). *Id.* (where the Government declines to intervene, relator shall receive "an amount which the court decides is reasonable" between 25 and 30 percent).[24] There is no basis to increase Relators' share above 25 percent. Relators had extremely limited information and knowledge, they did not promptly report their information to the Government and instead participated in the fraud, they failed to prosecute their claims against Medworx for more than four years following the Government's declination, and they instead spent years litigating against the Government—on whose behalf they purportedly brought this action—consuming considerable Government resources.

**CONCLUSION**

For the foregoing reasons, the Court should conclude as follows: (1) Relators are not entitled to a relator share based on the criminal prosecutions of Spell and Walters, which were not alternate remedies to this action; (2) any default judgment against Medworx should be based on TRICARE claims paid to Medworx for prescriptions marketed by Senn; and (3) Relators should receive 25 percent of the proceeds of the judgment issued against Medworx in this case.

The United States respectfully requests oral argument.

---

[24] As explained in Section II, the range applicable to an alternate remedy recovery (where the Government pursued the claims) and a judgment in a declined case (where Relators pursued the claims) is different.

Date:  November 19, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

TODD W. GEE
United States Attorney

/s/ *Deidre L. Colson*
ANGELA GIVENS WILLIAMS, MSB 102469
DEIDRE L. COLSON, MSB#10125
Assistant United States Attorney
United States Attorney's Office
Southern District of Mississippi
501 East Court Street, Suite 4.430
Jackson, MS 39201
Telephone:  (601) 973-2822
angela.williams3@usdoj.gov
deidre.colson@usdoj.gov

JAMIE ANN YAVELBERG
NATHAN P. GREEN
JEFFREY A. MCSORLEY
Attorneys, Civil Division
Commercial Litigation Branch
United States Department of Justice
P.O Box 261, Ben Franklin Station
Washington, DC  20044
Telephone:  (202) 305-3669
Email:  Nathan.P.Green@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2024, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which sent notification to all counsel of record.


s/ *Deidre L. Colson*
DEIDRE L. COLSON